**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

JAMES CALLANAN,

        Defendant.

No. CR 08-12-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING SENTENCING
AND SANCTIONS FOR THE
PROSECUTION'S BREACH OF THE
DEFENDANT'S PLEA AGREEMENT**

———————————

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *A. Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        *1.   Callanan's charge, plea agreement, and guilty plea* . . . . . . . . 3
        *2.   The PSIR and sentencing arguments* . . . . . . . . . . . . . . . . . 4
        *3.   The prosecutorial misconduct issue* . . . . . . . . . . . . . . . . . 5
    *B. The Sentencing Hearing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    *A. Analytical Process For Breach Of A Plea Agreement* . . . . . . . . . . . 11
    *B. Step One:  Breach* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    *C. Step Two:  Remedy* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        *1.   Available remedies* . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        *2.   Is any remedy required?* . . . . . . . . . . . . . . . . . . . . . . . 17
        *3.   Sufficiency of a typical remedy* . . . . . . . . . . . . . . . . . . . 21
        *4.   Rejection of the remedy applied in* Dicus . . . . . . . . . . . . . 22
        *5.   Imposition of fees and costs* . . . . . . . . . . . . . . . . . . . . . 23

*III.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

For the third time in less than a year, and for the second time in just two months, I have been reassigned a case for sentencing in which Chief Judge Reade has found that the United States Attorney's Office for the Northern District of Iowa, the representative of the executive branch of the government, has breached the defendant's plea agreement. The recidivism of this United States Attorney's Office is particularly troubling in light of the flimsy, Ginsu-sliced-tomato thin excuses advanced by the prosecutors in these cases as to why they had not breached the plea agreements.[1] As Justice Sutherland explained so eloquently some seventy years ago,

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to

---

[1]Wikipedia reminds us that "[t]he Ginsu knife is a product most famous for the promotional activities that were used to promote it. It was made famous through a series of long-form advertisements in the 1970s and it is claimed paved the way for the modern day infomercial with its use of quirky catchphrases, comical quips, and urgent call to action, including the phrase 'how much would you pay . . . don't answer' and 'but wait, there's more.'" http://en.wikipedia.org/wiki/Ginsu_knife. A current shopping website featuring Ginsu knives proclaims, "We all remember the late-night TV advertisements that demonstrated the Ginsu knives cutting through tin cans and sawing through lead pipes and then thinly slicing tomatoes. The Ginsu knives can tear through leather and then cut perfect bread slices." http://www.shopginsu.com/s.nl/it.A/id.120/.f?category=997&sc=130.

> strike foul ones. It is as much his duty to refrain from
> improper methods calculated to produce a wrongful conviction
> as it is to use every legitimate means to bring about a just one.

*Berger v. United States,* 295 U.S. 78, 88 (1935). Two and a half centuries ago, Montesquieu stated the principle more succinctly and more emphatically: "There is no more cruel tyranny than that which is exercised under cover of the law, and with the colors of justice." Montesquieu, DE L'ESPIRIT DES LOIS (1748), *quoted in United States v. Jannotti,* 673 F.2d 578, 614-15 (3d Cir. 1982) (Aldisert, C.J., dissenting). Although I found that the prosecution's breach of the plea agreement in the last such case was egregious and warranted a reduction in the defendant's sentence, *see United States v. Dicus,* ___ F. Supp. 2d ___, 2008 WL 4402214 (N.D. Iowa Sept. 24, 2008), I explained at the current defendant's sentencing hearing on October 21, 2008, that the prosecution's breach in this case presents a significantly different circumstance warranting a significantly different response. I now enter this memorandum opinion and order to memorialize more fully my rationale for my response to the prosecution's breach of the plea agreement in this case.

## I.  INTRODUCTION

### A.  Background

#### 1.    Callanan's charge, plea agreement, and guilty plea

In a single-count Indictment (docket no. 1), handed down January 30, 2008, defendant James Callanan was charged with knowingly and intentionally distributing a mixture or substance containing a detectible amount of heroin on or about December 16, 2003, resulting in serious bodily injury to C.W. from use of the heroin, all in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). In a plea agreement (docket no. 38-2) executed by

the parties on March 27, 2008, Callanan agreed to plead guilty to the lesser-included offense of distribution of heroin on the date charged. The plea agreement provided, *inter alia*, that "pursuant to USSG § 2D1.1(a)(2), the appropriate base offense level is **12** because defendant distributed less than 5 grams of heroin to another person." Plea Agreement, ¶ 20.A (emphasis in the original). Callanan did, in fact, plead guilty to the lesser-included offense before a magistrate judge of this district on March 31, 2008, and, on April 15, 2008, Chief Judge Reade, to whom this case was then assigned, accepted the magistrate judge's recommendation that the court accept Callanan's guilty plea. *See* Order (docket no. 40). Callanan's sentencing was set for September 25, 2008. *See* Order (docket no. 41).

### 2. *The PSIR and sentencing arguments*

Prior to Callanan's sentencing, the probation officer completed a presentence investigation report (PSIR) recommending that Callanan be held responsible for the equivalent of 751.27 grams of heroin and, consequently, that his base offense level would be 30. PSIR, ¶ 44. On August 29, 2008, Chief Judge Reade received a letter (docket no. 43) dated August 26, 2008, from defendant Callanan himself protesting the difference between the drug quantity and base offense calculations in the PSIR and the drug quantity and base offense stipulation in his plea agreement and requesting a new attorney, because of Callanan's unhappiness with the way that his attorney was handling the matter. On September 2, 2008, the prosecution filed a Sentencing Memorandum in which the prosecution argued, consistent with the probation officer's recommendation in the PSIR, that Callanan should be held responsible for the equivalent of 751.27 grams of heroin and, consequently, that his base offense level should be 30. Prosecution's Sentencing Memorandum (docket no. 42), 3-4. On September 11, 2008, Callanan filed a Sentencing Memorandum calling the court's and the prosecution's attention to the paragraph of the

plea agreement stipulating to a base offense level of 12, because the defendant distributed less than 5 grams of heroin to another person, and asking the court to adopt that stipulation. Defendant's Sentencing Memorandum (docket no. 45), 2.

On September 12, 2008, the day after Callanan filed his Sentencing Memorandum, the prosecution promptly filed an Amended Sentencing Memorandum in which the prosecution stated,

> The government filed a sentencing memo indicating that it intended to produce evidence in support of the higher drug quantity found by the probation office. Defendant reminded the government that the plea agreement contained a stipulation as to drug quantity. Defendant has done nothing to breach the plea agreement, and therefore the United States is bound by its agreement. Accordingly, the government will maintain that the defendant should be sentenced on a base offense level 12 for drug quantity.

Prosecution's Amended Sentencing Memorandum (docket no. 46), 1; *see also id*. at 2 ("In the plea agreement reached by the parties, the United States and the defendant stipulated to a base offense level 12 for drug quantity. The United States Probation Office found a base offense level 32 [sic: 30] was appropriate based on historic drug quantities. (PSIR ¶¶ 22, 23, 24 & 25). The United States is bound by the plea agreement and maintains that the proper base offense level is 12.").

### 3. *The prosecutorial misconduct issue*

At the sentencing hearing on September 25, 2008, Chief Judge Reade raised what she described as a "serious problem with this case" concerning defendant Callanan's complaint about drug quantity and request for a new attorney. Real Time Transcript,

September 25, 2008, Sentencing Hearing (Transcript of First Sentencing Hearing), 3.[2]
Chief Judge Reade found that "[t]his is the third time in a very short amount of time when the Court is faced with a situation where the government has breached a plea agreement." *Id.* After identifying the two previous situations, *see United States v. Mosley*, 505 F.3d 804 (8th Cir. 2007); *Dicus*, ___ F. Supp. 2d ___, 2008 WL 4402214,[3] Chief Judge Reade stated that she had realized that "something was wrong," yet again, from defendant Callanan's letter. *Id.* at 4. She then observed,

> I thought this would work out at sentencing, until I received the amended sentencing memo filed by the United States on the 12th of September, in which they admit that the sentencing memo they had previously filed at document 42 was not consistent with the plea agreement. The plea agreement agreed to a specific offense level. And in the sentencing memo filed as document 42, the government argued to the Court that the Court should find that the drug quantity was as found by the probation office. The probation office had gone to the discovery file and apparently found an interview wherein the defendant admitted more drug quantity in prior years. This kept me awake last night because the Court was faced with what I believe is, again, a serious breach of a plea agreement. Drug quantity is one of the central issues in this case. And the government, for whatever reason—maybe they didn't read

---

[2]The record reflects that, at the sentencing hearing on September 25, 2008, the defendant explained that his problems with his attorney were a "misunderstanding" and that he was, therefore, withdrawing his request for a new attorney. Transcript of First Sentencing Hearing at 6-7.

[3]Although Chief Judge Reade had found a breach of the plea agreement in Dicus's case in a sealed order dated December 12, 2007, my decision regarding the remedy for that breach was not filed until the day before Callanan's sentencing hearing before Chief Judge Reade. Thus, my decision in *Dicus* could not have been a "warning shot" in this case concerning remedies for breaches of plea agreements.

their own plea agreement—but they argued to me already in document 42 for the different drug quantity. Under those circumstances, this Court has no choice but to recuse, once again, for breach of a plea agreement. This is a pattern that I think the U.S. Attorney's Office in this district had best deal with. And it isn't just that it upsets Mr. Callanan, although it clearly upset Mr. Callanan and his attorney, but it is the total waste of the government's resources when I consider the government as a whole. This case I set aside time for. I prepared for. The attorneys prepared for it. The marshals during this flood situation are under a great deal of stress. They have to move prisoners from a great distance away for a sentencing at nine o'clock in the morning. They've been inconvenienced. They've wasted the taxpayer's money because of this. And now we have to move this defendant to a different judge and start all over again. And that nearest judge is 350 miles away. So what that's going to involve is moving Mr. Callanan to Sioux City for a sentencing. Mr. Roush [defense counsel] is going to have to travel over there at government expense, and that's a full day's travel, in addition to preparation time. So I am very disturbed about this. I don't understand it. And I hereby recuse myself from this case.

Transcript of First Sentencing Hearing at 4-6.

The Assistant United States Attorney (AUSA) prosecuting the case requested the opportunity to respond to Chief Judge Reade's finding that the government had breached the plea agreement and was granted leave to do so. *Id.* 7. The AUSA admitted that the argument for a higher drug quantity and base offense level in the initial Sentencing Memorandum was "an oversight" and "an error," because he had not remembered that there was a stipulation as to drug quantity, but he asserted that he had promptly indicated, in the Amended Sentencing Memorandum, that the prosecution would stand by the plea agreement. *Id.* at 8. The AUSA argued, "Because my error was pointed out and my

oversight was pointed out before we got to the sentencing hearing, I don't believe there's been any breach of the plea agreement." *Id.* The prosecutor then reiterated his intention to stand by the plea agreement. *Id.*; *see also id.* at 9 (acknowledging, again, that there had been a mistake, but that it had been addressed by the Amended Sentencing Memorandum before the hearing, that the prosecution did not intend to offer any evidence, and that, consequently, there had been no breach of the plea agreement). The prosecutor also suggested that the defendant had made arguments concerning acceptance of responsibility that were in breach of the plea agreement. *Id.* at 8-9.

The prosecutor's arguments notwithstanding, Chief Judge Reade stood by her finding of a breach of the plea agreement and her decision to recuse herself, finding that the prosecution could not "unring the bell" after arguing for a drug quantity substantially in excess of the quantity to which the parties had stipulated in the plea agreement. *Id.* at 10. She concluded, as follows:

> The other thing I would say is, I do not excuse the government's behavior. I think that the government, as the people's representative, has a higher burden to make sure that they are in strict compliance with the agreements that they make. The defense side is somewhat different. Defense attorneys do their client's bidding to the extent that it is not unethical. And the government is held in these agreements to a much higher standard, and I think that is appropriate in view of the penalties that defendants face in the federal system.

Transcript of First Sentencing Hearing at 11-12.

Subsequently, on September 29, 2008, Chief Judge Reade entered an order recusing herself from this matter, pursuant to *Santobello v. New York*, 404 U.S. 257 (1971), as construed in *Mosley*, 505 F.3d 804, based upon her finding that the prosecution had breached its plea agreement in this case. *See* Order (docket no. 48). In her recusal order,

Chief Judge Reade found that the prosecution's argument, in its initial Sentencing Memorandum, for a finding that Callanan was responsible for 751.27 grams of heroin and that his base offense level should be 30 was "a clear violation of the Plea Agreement." *Id.* at 1. She found, further, that the language of the plea agreement "is plain and unambiguous, and thus the court shall hold the government to its end of the bargain." *Id.* at 2. Because she concluded that her finding of a breach of the plea agreement required her to recuse herself, she directed the Clerk of Court to reassign the case to another district court judge. *Id.*

After Chief Judge Reade recused herself, this matter was reassigned to me for sentencing.

## B. *The Sentencing Hearing*

This matter came before me on October 21, 2008, for sentencing, after reassignment to me following Chief Judge Reade's recusal. In an effort to minimize some of the inconvenience to the defendant and his counsel arising from the need to sentence defendant Callanan before a different district court judge, I reset Callanan's sentencing in Cedar Rapids, Iowa, instead of Sioux City, Iowa.

Prior to the rescheduled sentencing hearing, both parties filed supplemental sentencing memoranda. In his Sentencing Memorandum (docket no. 51), filed October 14, 2008, defendant Callanan notes only that the parties had stipulated to appropriate guidelines calculations, including a base offense level of 12. He does not, however, make any reference to the prosecution's breach of the plea agreement found by Chief Judge Reade or argue for any specific remedy or sanction for such breach. In its Supplemental Sentencing Memorandum (docket no. 52), filed October 15, 2008, the prosecution merely states, "In the plea agreement reached by the parties, the United States and the defendant

stipulated to a base offense level 12 for drug quantity. The United States Probation Office found a higher base offense level appropriate based on historic drug quantities. (PSIR ¶¶ 22, 23, 24 & 25). The United States is bound by the plea agreement and maintains that the proper base offense level is 12." Prosecution's Supplemental Sentencing Memorandum (docket no. 52), 1-2. Also prior to the hearing, on October 20, 2008, I entered an order directing the parties to review and be prepared to discuss the following decisions as they relate to what sanctions, if any, should be imposed for the prosecution's breach of defendant Callanan's plea agreement: *United States v. Dicus*, ___ F. Supp. 2d ___, 2008 WL 4402214 (N.D. Iowa Sept. 24, 2008), and *United States v. Horn*, 29 F.3d 754 (1st Cir. 1994).

I find that the breach of the plea agreement in this case was inadvertent and due to a mistake and, still more specifically, that the AUSA prosecuting the case had no intent to violate the plea agreement. When his violation was pointed out to him by defense counsel, he took prompt remedial action and withdrew his sentencing memorandum improperly urging the court to find a much higher base and total offense level. I also find that there was a total absence of facts to support a finding of bad faith and, indeed, that there was no bad faith—not even a whiff of it. I have always found that, during this AUSA's 11 years with the United States Attorney's Office for the Northern District of Iowa, he has acted with the utmost integrity and with an unfailing commitment to the highest ethical standards. I also find that this AUSA, unlike some in his position, has a deep understanding of and appreciation for the difference between "hard blows" and "foul ones," to use the parlance of Justice Sutherland. *See Berger*, 295 U.S. at 88. In sum, I find that this AUSA is a model prosecutor who demonstrates the highest ethical and professional standards of his noble calling.

At the sentencing hearing on October 21, 2008, in response to a question from me about any remedial steps that the U.S. Attorney's Office for the Northern District of Iowa has taken to avoid breaches of plea agreements in the future—given this recent and recidivist trio of such breaches by that Office—the prosecutor responded that the response had been fourfold. First, immediately upon receipt of my opinion in *Dicus*, the Criminal Section Chief held a meeting with the Assistant U.S. Attorneys in the District. Secondly, there was a prompt hour-long training session on the subject of plea breaches by the U.S Attorney's Office. While I did not inquire as to the details of the training, my hope is that the purpose of the training was to avoid similar breaches in the future rather than, for example, to brainstorm on theories about how to get the *Dicus* opinion overturned or to plot strategies to wiggle out of future breaches. Thirdly, the Office is working on revising the plea agreements to highlight changes made in the negotiation process so as to provide an extra alert to AUSAs and, thus, to assist in avoiding plea breaches. Finally, the Office is going to engage in further training on the subject. Based on these representations, I find that the United States Attorney's Office for the Northern District of Iowa has undertaken good faith remedial measures to reduce the likelihood of future breaches of plea agreements.

## II.  LEGAL ANALYSIS

### A.  Analytical Process For Breach Of A Plea Agreement

In *Dicus*, I recognized the due process implications of the prosecution's breach of a plea agreement and the "recidivist" status of the United States Attorney's Office for the Northern District of Iowa, in light of the violations of plea agreements, in similar ways and within a relatively short time span, in that case and in *Mosley*. *Dicus*, ___ F. Supp. 2d at ___, 2008 WL 4402214 at *7. The court little expected that it would be faced with yet

11

another breach of a plea agreement so soon, even from a "recidivist." I also noted that, when a defendant asserts that the prosecution has breached a plea agreement, the court engages in a two-step process: The court must first determine whether or not there has been a breach of the plea agreement, and if there has been a breach, then determine the proper remedy. *Id.* at *8 (citing *United States v. E.V.*, 500 F.3d 747, 751 & 754 (8th Cir. 2007), and *Mosley*, 505 F.3d at 809-12, noting that the latter case held that, where there has been a breach of the plea agreement, harmless-error analysis does not apply, and the court must consider the proper remedy). As in *Dicus*, Chief Judge Reade has already performed the first step in this case, by finding a breach of the plea agreement by the prosecution, and the two-step analysis is, again, bifurcated, because Chief Judge Reade has recused herself pursuant to *Santobello*, 404 U.S. at 262-63 (1971), as construed in *Mosley*, 505 F.3d at 809-12, leaving sentencing to me. *Dicus*, ___ F. Supp. 2d at ___, 2008 WL 4402214 at *8. I find, again, however, that, because the nature of the breach is relevant to the proper remedy, it is appropriate for me to examine both steps in the process. *Id.*

### B.  Step One:  Breach

As to the first step, determination of breach of the plea agreement, the court, interpreting the plea agreement according to general contract principles, considers whether the plea was induced by an "'enforceable, bargained-for term of the plea agreement' that has been violated." *Id.* (quoting *E.V.*, 500 F.3d at 752). I concur in Chief Judge Reade's conclusion that the stipulation in the plea agreement to a base offense level of 12, based on an offense involving less than 5 grams of heroin, was an "enforceable, bargained-for term of the plea agreement" that undoubtedly induced the defendant's plea, *id.*, in light of the potential for a much higher base offense level based on much higher quantities of heroin. I also concur in Chief Judge Reade's finding that this term was clear and

unambiguous.  Moreover, I agree with Chief Judge Reade that failure of the prosecution to live up to this term of the plea agreement, by arguing for a drug quantity more than 150 times the agreed quantity and a base offense level 18 levels higher than the agreed level, had the argument been allowed to stand, would have constituted a very serious breach of the plea agreement.

Nevertheless, had it been left to me, I am not sure that I would have found that the prosecution breached this base offense level term of the plea agreement in this case, *id.* (a bargained-for term of the plea agreement must have been violated), where, prior to the sentencing hearing, the prosecution acknowledged and corrected its improper argument for a higher drug quantity and higher base offense level and expressly reaffirmed its intention to stand by the plea agreement at sentencing.[4]  That said, my doubts are not deep-seated,

---

[4]Case law is somewhat mixed on whether or not asserting an improper argument, then retracting that argument before the sentencing, constitutes a breach of the plea agreement, although the majority position appears to be that an improper argument is a breach of the plea agreement, even if that improper argument is later retracted.  *Compare United States v. Munoz*, 408 F.3d 222, 227-29 (5th Cir. 2005) (the prosecution breached the plea agreement by urging an improper enhancement, even though, in closing, the prosecutor asked the court to follow the plea agreement, because that request, in light of the prosecutor's position on the enhancement, "amounted to little more than lip service to the plea agreement and did not rectify the breach"); *United States v. Taylor*, 77 F.3d 368, 370-71 (11th Cir. 1996) (where the prosecution had advocated a position contrary to the requirements of the plea agreement, but then ultimately recommended a sentence in compliance with the plea agreement, the latter recommendation "merely paid 'lip service' to the agreement, [and wa]s insufficient to rectify the breach committed when the government advocated a position requiring a longer sentence than it had agreed to recommend"); *United States v. Kurkculer*, 918 F.2d 295, 298 & n.5 (1st Cir. 1990) ("The trial judge stated that he was not influenced by the [prosecution's] offending sentencing recommendation, and held that the prosecution's retraction not only remedied the breach, but that there somehow was no breach at all," and even though there was no dispute on

(continued…)

a finding that no breach occurred based upon retraction of the offending argument may be contrary to the majority rule, and even if the issue is a close call in light of the prosecution's efforts to promptly rectify the situation in this case, I believe that it is important to defer to Chief Judge Reade's finding that the prosecution breached the plea agreement, where the "breach" and "remedy" steps in the analysis are bifurcated, as they are here. Additionally, prudential reasons suggest that, in the circumstances presented here, deference to a colleague's findings of breach of a plea agreement is warranted.

Moreover, the prosecution has offered no satisfactory argument that there was no breach in this case. As explained just above, the prosecution's argument that retraction of an improper argument means that there was no breach is contrary to the majority rule.

---

[4] (…continued)
appeal that there was a breach, the appellate court observed that "[i]t was clear error to say that no breach ever occurred"); *with United States v. Nguyen*, 213 F.3d 644, 2000 WL 300937 (9th Cir. 2000) (table op.) (concluding that no breach of the plea agreement occurred where the government corrected its improper recommendation in an amended sentencing memorandum); *see also United States v. Amico*, 416 F.3d 163, 165-68 (2d Cir. 2005) (holding, as to one alleged breach, that "[w]hile we do not mean to imply that a retraction of an argument advanced by the government in violation of its plea agreement would always cure its breach, we conclude upon careful examination of all the circumstances, especially the mild, brief, and unassertive form of the statement and its rapid retraction, that the temporary breach was adequately cured"; holding as to other alleged breaches that there had been no breach at all; and holding that a final alleged breach "was at worst a technical violation which had no consequence and should not require vacating the sentence"); *In re Arnett*, 804 F.2d 1200, 1204 (11th Cir. 1986) (the prosecution breached the terms of the plea agreement by seeking forfeiture of the defendant's farm, but because the defendant had suffered no prejudice "to date" from the filing of the complaint for forfeiture of his farm, it was "appropriate . . . to allow the United States Attorney to cure the breach of the plea bargain by withdrawing the forfeiture action against [the defendant's] house and farm," but if the prosecution elected to pursue its forfeiture action, the district court was directed to grant the defendant's motion to vacate his plea).

14

Equally unavailing is the prosecution's assertion, at the October 21, 2008, sentencing hearing, that the filing of its September 2, 2008, Sentencing Memorandum asking for an increase from the stipulated base offense level of 12 to 30 was somehow not a breach of the plea agreement. At the hearing, for the first time, the prosecutor argued that there was no breach of the plea agreement based on paragraph 21 of that agreement. The pertinent paragraph states the following:

> 21. The defendant, his attorney and the United States may make whatever comment and evidentiary offer they deem appropriate at the time of the guilty plea, sentencing or any other proceeding related to this case, so long as the offer or comment does not violate any other provision of this agreement. The parties are also free to provide all relevant information to the probation office for use in preparing the presentence report.

Plea Agreement, ¶ 21. The prosecutor suggested that this paragraph meant that, so long as his improper argument was withdrawn before the sentencing hearing, there was no breach of the plea agreement. This argument is beyond frivolous and beneath the dignity of any officer of the court—especially the United States Attorney's Office—even after that Office's recent recidivist breaches of multiple plea agreements. Paragraph 21 would have *expressly prohibited* the prosecutor's argument for a base offense level higher than 12, because such an argument would plainly violate the stipulation in paragraph 20.A. that the appropriate base offense level is 12. *See id.* (permitting the United States to offer evidence or to make comments "so long as the offer or comment does not violate any other provisions of this agreement"). Paragraph 21 is completely silent about withdrawal of improper arguments. Thus, no reading of paragraph 21, however strained, exculpates the United States Attorney's Office for the Northern District of Iowa from a judicial finding that the Office's improper argument here was a clear breach of the plea agreement.

Therefore, I decline to "unring the bell" and set aside Chief Judge Reade's finding of a breach of the plea agreement by the prosecutor, the representative of the executive branch of government, as the prosecutor has urged me to do here.

## C. Step Two: Remedy

### 1. Available remedies

Although I am unwilling to revisit the question of whether or not the prosecution has breached the plea agreement in this case, I believe that it is appropriate for me to reach an independent conclusion about what, if any, remedy is required for the breach of the plea agreement found by Chief Judge Reade. This is so, because the second step in the analysis, the determination of the appropriate remedy, is entirely for me to decide. *Dicus*, ___ F. Supp. 2d at ___, 2008 WL 4402214 at *8 & *9 (citing *Mosley*, 505 F.3d at 809-12, as holding that, where there has been a breach of the plea agreement, harmless-error analysis does not apply, and the court must consider the proper remedy).

In *Dicus*, I noted that the typical remedies for the prosecution's breach of a plea agreement are allowing the defendant to withdraw his guilty plea or to demand specific performance of the plea agreement. *Id.* at *9. I also noted that the Second Circuit Court of Appeals had held that "'[t]here is a very limited exception to the need for a remedy for a plea agreement breach by the government where the violation is so minor that it does not cause the defendant to suffer any meaningful detriment.'" *Id.* at *10 (quoting *United States v. Vaval*, 405 F.3d 144, 155 (2d Cir. 2005)). The Second Circuit Court of Appeals explained that, "[i]n assessing whether a defendant suffered a meaningful detriment, the critical question is what the defendant reasonably understood to be the terms of the plea agreement, and whether his or her reasonable expectations have been fulfilled." *Vaval*, 404 F.3d at 155. Similarly, the Eighth Circuit Court of Appeals has held that no relief

from the prosecution's violation of a plea agreement was appropriate where the sentencing court refused to impose the enhancement for which the prosecution had improperly argued, in derogation of its promises in a plea agreement. *See E.V.*, 500 F.3d at 755. Finally, in *Dicus*, I concluded that, where typical remedies are inadequate, the "touchstones" for the appropriate remedy were identified in *Santobello* as "'the interests of justice and appropriate recognition of the duties of the prosecution in relation to promises made in the negotiation of pleas of guilty.'" *Dicus*, ___ F. Supp. 2d at ___, 2008 WL 4402214 at *13 (quoting *Santobello*, 404 U.S. at 262-63). Using these "touchstones" in *Dicus*, I concluded that the appropriate remedy was to reduce the defendant's sentence to the low end of his advisory sentencing guidelines range, even though I would otherwise have sentenced him at the top of his guidelines range, as a sanction for serious and recidivist prosecutorial misconduct. *Id.* at *14-*17. The circumstances of the present case suggest that I must now consider whether additional sanctions may also be appropriate as remedies for the prosecution's breach of a plea agreement.

### 2. *Is any remedy required?*

I have carefully considered whether this might be a case in which no remedy is appropriate, because the prosecution's breach of the plea agreement was not "serious," but "minor," because it was promptly acknowledged by the prosecution, the improper argument was withdrawn, and the improper argument caused the defendant no meaningful detriment. *See Vaval*, 405 F.3d at 155 (no remedy is required for the prosecution's violation of a plea agreement "where the violation is so minor that it does not cause the defendant to suffer any meaningful detriment."). I find that the breach here was "minor," in the sense that the prosecution's initial sentencing recommendation was plainly in breach of the plea agreement, but that argument was promptly withdrawn *before* the sentencing hearing. Moreover, I cannot imagine what more prompt and appropriate action the

prosecutor in this case could have taken to remedy his initial, improper sentencing recommendation; indeed, he is to be commended for his efforts to put the matter right before the court could act on his improper recommendation. His actions, thus, were consistent, not inconsistent, with the special responsibilities of the United States Attorney to do justice, not simply to win, noted in *Berger*, 295 U.S. at 88, and quoted above. The AUSA in this case has practiced before me for 11 years, and I have had him on many, many criminal cases, including two of the most complicated, daunting, and lengthy criminal cases ever tried in this district, which resulted in nearly thirty reported decisions. On every occasion, he has performed admirably, and he has always maintained the highest commitment to fairness and integrity. In short, he is a model AUSA who, as Justice Sutherland observed in *Berger* 295 U.S. at 88, understands fully that he may "prosecute with earnestness and vigor" and that he may "strike hard blows," but "is not at liberty to strike foul ones." In this case, I specifically find that the breach of the plea agreement was not intentional and was the result of inadvertence and mistake. When the prosecutor was made aware of his error, he took prompt remedial action. This is the exact opposite of the responses of the AUSAs in *Mosley* and *Dicus*, which were to continue to press arguments that were in direct violation of the plea agreements and that, as a result, were thinner than a Ginsu-sliced tomato. Therefore, in this case, the defendant's reasonable expectations have ultimately been fulfilled, because the prosecution has reaffirmed that it will stand by the plea agreement. *See Vaval*, 405 F.3d at 155 ("In assessing whether a defendant suffered a meaningful detriment, the critical question is what the defendant reasonably understood to be the terms of the plea agreement, and whether his or her reasonable expectations have been fulfilled.").

Nevertheless, I cannot find that the defendant suffered no meaningful detriment from the prosecution's breach of the plea agreement in this case. *Id.* From at least

September 2 through September 12, 2008, the dates of the prosecution's initial Sentencing Memorandum containing the improper argument concerning base offense level and drug quantity and the prosecution's Amended Sentencing Memorandum withdrawing the improper argument and reaffirming the plea agreement's base offense level and quantity stipulations—and almost certainly for longer than that, because the defendant's letter to Chief Judge Reade dated August 26, 2008, shows that he was already concerned about the status of the stipulations in his plea agreement based on the PSIR—the defendant was in dread that he would face a sentence based on a drug quantity more than 150 times the agreed quantity and a base offense level 18 levels higher than the agreed level. More generally, defendants—and, indeed, the public, the defense bar, and the court—suffer from a loss of confidence and faith in prosecutors and their function when prosecutors breach plea agreements and, thus, violate the due process rights of the accused. That detriment is amplified here, where this United States Attorney's Office has been caught in recidivist breaches of plea agreements and, thus, repeated violations of the due process rights of the defendants.

I have also carefully considered whether this is a case in which no relief from the prosecution's violation of a plea agreement is appropriate, because I, as the sentencing judge, have refused to impose the enhancement for which the prosecution initially, improperly argued, in derogation of its promises in a plea agreement. *See E.V.*, 500 F.3d at 755. Specifically, after the finding of a breach by another judge, I have disregarded the higher drug quantity and higher base offense level recommended by the probation office and initially, improperly recommended by the prosecutor and, instead, consistent with the plea agreement, I have found that the base offense level is 12, based on less than 5 grams of heroin. Thus, the defendant stands in the same position that he would have occupied, had the original judge been presented only with a sentencing recommendation by the

prosecution that was consistent with the plea agreement and the very different recommendation of the probation office in the PSIR for a much higher base offense level based on a much higher drug quantity—*i.e.*, the defendant stands in the same position that he would have occupied had there been no breach of the plea agreement by the prosecution. I recognize that, in *Mosley*, the Eighth Circuit Court of Appeals cited *Santobello*, 404 U.S. at 262-63, as holding that it was immaterial whether the trial judge, who had sentenced the defendant prior to discovery of the prosecution's breach of the plea agreement, had subsequently stated that the prosecution's improper sentencing recommendation had not influenced him. *Mosley*, 505 F.3d at 810. The Eighth Circuit Court of Appeals concluded from this holding in *Santobello* that the Supreme Court had rejected the view that the prosecution's breach could have been harmless. *Mosley*, 505 F.3d at 810. Here, in contrast to the circumstances in *Santobello*, Callanan had not yet been sentenced when the prosecution's improper sentencing recommendation, in breach of the plea agreement, was discovered by the parties *and expressly and unequivocally withdrawn by the prosecution, with a reaffirmation of the prosecution's intent to stand by the plea agreement*. Thus, while harmless-error analysis does not apply to the prosecution's breach of a plea agreement, *Mosley*, 505 F.3d at 811, it might be possible to find that the breach has not actually prejudiced the defendant, because I have refused to impose the enhancement for which the prosecution initially, improperly argued, in derogation of its promises in a plea agreement. *See E.V.*, 500 F.3d at 755.

Here, however, I find that I must consider not only whether no other remedy is required—because of my refusal to impose the enhancement for which the prosecution initially, improperly argued, in derogation of its promises in the plea agreement, *see id.*, which has the same effect as enforcing the breached term of the plea agreement, as the parties now request—but also consider whether some other remedy or sanction is required,

because this is *not* the first time that this United States Attorney's Office has breached a plea agreement. The first step in my consideration of that question is to determine whether enforcement of the plea agreement is a sufficient remedy.

### 3.     *Sufficiency of a typical remedy*

Unlike the situation in *Dicus*, where the typical remedies for breach of a plea agreement by the prosecution—allowing the defendant to withdraw his guilty plea or to seek specific performance of the plea agreement—were inadequate, *see Dicus*, ___ F. Supp. 2d at ___, 2008 WL 4402214 at *12, in this case, I find that the latter remedy of specific performance of the plea agreement is entirely appropriate. Indeed, in Callanan's September 11, 2008, Sentencing Memorandum, in which he pointed out that the prosecution's initial sentencing recommendation was contrary to the stipulation concerning his base offense level, Callanan expressly asked the court to adopt that stipulation. Defendant's Sentencing Memorandum (docket no. 45), 2. Thus, specific performance is the remedy initially selected by the defendant in this case.[5] Such a remedy also serves what I indicated in *Dicus* were the "touchstones" for the appropriate remedy, gleaned from *Santobello*: "'the interests of justice and appropriate recognition of the duties of the prosecution in relation to promises made in the negotiation of pleas of guilty.'" *Dicus*, ___ F. Supp. 2d at ___, 2008 WL 4402214 at *13 (quoting *Santobello*, 404 U.S. at 262-63). This is so, because the defendant receives what he expected from the plea agreement, and the prosecution's promise is enforced.

---

[5]At the sentencing hearing on October 21, 2008, the defendant also argued that a *Dicus*-like remedy for the prosecution's breach of the plea agreement would be to reject the four-level upward departure pursuant to U.S.S.G. §§ 5K2.0, 5K2.2, and 5K2.21 to which he had stipulated in the plea agreement. For the reasons stated in this opinion, I reject that remedy.

This comparatively limited remedy is all the more appropriate where the breach in question was inadvertent and devoid of any bad faith and, moreover, where the prosecutor took prompt remedial action as soon as he had notice of his mistake. It is also made more appropriate by the remedial actions of the United States Attorney's Office for the Northern District of Iowa since my decision in *Dicus* to attempt to prevent further such incidents. As noted above, those remedial actions have included the following: (1) a meeting called promptly by the Criminal Section Chief with the AUSAs in the district to discuss the problem; (2) a prompt training session on the subject of plea breaches by the United States Attorney's Office; (3) attempts to revise the plea agreements to highlight changes made in the negotiation process so as to provide an extra alert to AUSAs and, thus, to assist in avoiding plea breaches; and (4) a commitment to engage in further training on the subject. These good faith actions to avoid future breaches temper the remedy that I feel it is necessary to impose for this breach.

### 4. *Rejection of the remedy applied in* Dicus

I expressly *do not find* that a sentencing reduction is an appropriate remedy in this case, although I did find that such a remedy was appropriate in *Dicus*, because I do not find that it is necessary to impose tangible consequences for the prosecution's misconduct in this case, beyond enforcement of the base offense level to which the parties stipulated, notwithstanding that the defendant could have been subject to a much higher base offense level, if I had adopted the probation office's recommendation in the PSIR or the prosecution's initial, improper recommendation. *See Dicus*, ___ F. Supp. 2d at ___, 2008 WL 4402214 at *15 (citing Sonja Starr, *Sentence Reduction as a Remedy for Prosecutorial Misconduct*, 2 & n.10 (unpublished draft, September 2, 2008; used by permission), as citing commentators who have suggested that the appropriate remedy is a combination of sanctions, including sentence reductions, to deter misconduct and to give defendants an

incentive to raise misconduct claims). Nor is such a remedy necessary in this case to provide an important incentive to defendants to raise issues of prosecutorial misconduct, where this defendant has received what he expected to receive from the plea agreement's stipulation on a base offense level of 12. *Id.* The remedy of a sentence reduction also is not necessary here, because the typical remedy of specific performance enforcement of the plea agreement is adequate and available. *Id.* Finally, such a remedy is not necessary to serve the interests of justice from a public perspective, where those interests are served by enforcement of the plea agreement. *Id.*

### 5.     *Imposition of fees and costs*

Finally, I turn to the question of whether some other remedy or sanction is *also* required or appropriate, in addition to enforcement of the breached term of the plea agreement, because this is *not* the first time that this United States Attorney's Office has breached a plea agreement. As I remarked at the outset of this opinion, and I have been at pains to reiterate throughout, this is the third time in less than a year, and the second time in just two months, that a prosecutor in this United States Attorney's Office has breached a plea agreement. These circumstances, seem to me, to require consideration of *additional* sanctions. Although I do not make a practice of checking whether my prior decisions have been appealed, I have been advised that both parties have now appealed my decision in *Dicus*. Thus, recognizing the possibility that the Eighth Circuit Court of Appeals could conclude that a sentencing reduction is not an appropriate remedy for the prosecution's breach of a plea agreement, I wish to explore whether sanctions directed at individual breaching prosecutors are also available remedies to combat what has now because a serious recidivism problem with breaching plea agreements in the United States Attorney's Office for this district.

In *Dicus*, I contemplated, albeit only briefly, whether a fine was an appropriate remedy for prosecutorial misconduct, but I noted that "a fine against the prosecutor personally would inflict a private sanction for official misconduct, and a fine against the United States would be no deterrent at all, no matter how large." 2008 WL 4402214 at *15. It appears, however, that even the court's supervisory power to sanction misconduct of parties practicing before it cannot overcome the sovereign immunity of the federal government. *See, e.g., United States v. Horn*, 29 F.3d 754, 767 (1st Cir. 1994) (after an extensive analysis of the "unavoidable tension" between the doctrines of sovereign immunity and supervisory power, in a case considering whether principles of sovereign immunity bar a federal district court, exercising its supervisory power, from assessing attorneys' fees and costs against the federal government in a criminal case for "unpardonable misconduct committed by a federal prosecutor who should have known better," holding "that fee-shifting against the government can be accomplished only in conjunction with the passage of a statute (or a sufficiently explicit rule having the force of a statute) that authorizes such an award. In the absence of such an enactment, the secondary principle of sovereign immunity saves the federal government harmless from all court-imposed monetary assessments, regardless of their timing and purpose.").

That is not to say that the court is powerless to sanction *individual prosecutors*, however. As the First Circuit Court of Appeals explained in *Horn*, "There would seem to be no sovereign immunity bar to imposing a monetary penalty as a sanction against a rogue attorney merely because she happens to represent the federal government." *Id.* at 766 n.14 (citing *Larsen v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 693 (1949); *Chilcutt v. United States*, 4 F.3d 1313, 1327 (5th Cir. 1993); and *United States v. Sumitomo Marine & Fire Ins. Co., Ltd.*, 617 F.2d 1365, 1370-71 (9th Cir. 1980)). The court in *Horn* explained, further,

The fact that sovereign immunity forecloses the imposition of monetary sanctions against the federal government in criminal cases does not leave federal courts at the mercy of cantankerous prosecutors. Courts have many other weapons in their armamentarium. This case aptly illustrates the point. The district judge ordered, among other things, the removal and quarantine of the lead prosecutor, the suppression of tainted documents, and the advance disclosure of the government's trial strategy. In addition, the judge could have ordered the lead prosecutor to pay the accumulated fees, *see Chilcutt*, 4 F.3d at 1319 (upholding order that government counsel pay, *inter alia*, for time spent by defense counsel at contempt hearing, without being reimbursed); *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1370-71 (9th Cir. 1980) (upholding imposition of monetary sanction for discovery abuse against government attorney as the "only available target for such sanctions"), but did not see fit to do so. He also could have ordered the prosecutor to attend ethics seminars at her own expense, *see Chilcutt*, 4 F.3d at 1319, dispatched her to the Justice Department's internal disciplinary office, *see [United States v.] Hasting*, 461 U.S. [499,] 506 n. 5, 103 S. Ct. [1974,] 1979 n. 5 [(1983)], or publicly reprimanded the Justice Department itself, *see United States v. Prince*, 1994 WL 99231 at *1-2, 1994 U.S.Dist. LEXIS 2962 at *1-*4 (E.D.N.Y.1994). While this list is not exhaustive, we are confident that it shows beyond serious question that the court had ample means at its disposal, even without feeshifting, to catch the Justice Department's attention, punish the culprit, and deter future prosecutorial excesses.

*Horn*, 29 F.3d at 766-67 (footnotes omitted).

I remain just as reluctant now as I was at the time of my decision in *Dicus* to impose a fine against the prosecutor personally, because doing so would inflict a private sanction for official misconduct. 2008 WL 4402214 at *15. That reluctance could wane rapidly, however, in the face of any further violations of plea agreements by prosecutors in the

United States Attorney's Office for the Northern District of Iowa. Like Chief Judge Reade, I believe that "[t]his is a pattern that I think the U.S. Attorney's Office in this district had best deal with." Transcript of First Sentencing Hearing at 5. If the only way to catch the attention of the attorneys in that office as to the extent of my displeasure with repeated violations of plea agreements is to sanction them individually and personally, in an appropriate case, I will do so.

This is not, however, the appropriate case in which to impose additional, individual sanctions. As I observed above, the prosecutor's breach of the plea agreement in this case was inadvertent, and I cannot imagine what more prompt and appropriate action the prosecutor in this case could have taken to remedy his initial, improper sentencing recommendation, and he is to be commended, not sanctioned, for his efforts to put the matter right before the court could act on his improper recommendation. Therefore, while I leave the door wide open to impose sanctions, including monetary sanctions, against individual prosecutors for prosecutorial misconduct in an appropriate case, I will not impose such a sanction in this case.

I recognize that, because my decision in *Dicus* was filed only the day before Callanan's first sentencing hearing, it could not have provided the prosecutors in the United States Attorney's Office for the Northern District of Iowa with any warning of the possibility of individual sanctions against a breaching prosecutor, any more than it could have provided them with warning of the possibility of a sentence reduction as a possible remedy, before the breach of the plea agreement occurred in this case. The circumstances going forward, however, are quite different, and the prosecutors are now on notice of the full panoply of possible remedies and sanctions that I may consider, in appropriate cases, for any future breaches. Those prosecutors should also have no doubt that my patience is at an end, after three such breaches, two within the last two months, and that the defense

bar, the public, and the court can reasonably expect that plea agreements will be scrupulously complied with in the future. Therefore, in the future, even "inadvertent" breaches of plea agreements may incur individual sanctions. I note that Chief Judge Reade, likewise, observed concerning the most recent breach of a plea agreement that she was "very disturbed about this" and she "d[id]n't understand it." Transcript of First Sentencing Hearing at 6.

## III. CONCLUSION

Upon the foregoing, I conclude that the appropriate remedy for prosecutorial misconduct in this case is enforcement of the breached term of the plea agreement. Therefore, I determined that defendant Callanan's base offense level is 12. His total offense level rises to 16 based on a stipulation that he should receive at least a 4-level increase for substantial risk of death to another due to the heroin distribution. Finally, his total offense level is reduced by two levels for his acceptance of responsibility. Thus, his advisory United States Sentencing Guidelines range is 37-46 months and, after fully considering the 18 U.S.C. § 3553(a) factors, I have sentenced Callanan to a term of 42 months.

**IT IS SO ORDERED.**

**DATED** this 24th day of October, 2008.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA